**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **VONEKA Q. NETTLES,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 13-0605-WS-C** |
| | ) |
| **DAPHNE UTILITIES,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 69) with respect to the claims of plaintiff Voneka Nettles.  The Motion has been briefed and is now ripe for disposition.

**I.      Relevant Background.**

Voneka Nettles is one of three plaintiffs who brought this action alleging race-based employment discrimination by defendant, Daphne Utilities.[1]  As pleaded in the Amended Complaint, Nettles, who is African-American, has asserted claims of wage discrimination and discriminatory failure to transfer.  Counts I and II allege that Daphne Utilities violated Title VII, 42 U.S.C. § 1981, the Due Process Clause and 42 U.S.C. § 1983 "[b]y paying Plaintiff Nettles lower wages than her white co-employees performing similar duties."  (Doc. 6, ¶¶ 49-50.)  Meanwhile, Counts III and IV allege that Daphne Utilities violated the same provisions "[b]y refusing to hire/transfer/promote Plaintiff Nettles to the position vacated by Ms. Kellum,[] in favor of a white applicant."  (*Id.* at ¶¶ 51-52.)  Daphne Utilities contends that it is entitled to judgment as a matter of law with respect to all of these claims.

---

[1]      The other two plaintiffs, Carlos Butler and Cedric Goodloe, assert claims that are factually (and in some instances, legally) distinct from Nettles'.  In light of the individual-specific nature of each plaintiff's claims, the Court has ordered separate trials for each plaintiff. (*See* doc. 18.)  Defendant filed three plaintiff-specific Motions for Summary Judgment, each of which has been briefed independently.  This Order is confined to the claims of plaintiff Nettles, and neither considers nor adjudicates the claims of plaintiffs Butler or Goodloe.

### A.    Pay Differential between Plaintiff and Pam Kellum.

The pertinent record facts are as follows:[2]  Daphne Utilities hired Nettles as an Accounts Receivables Clerk in its Accounting Department in August 2005.  (Nettles Decl. (doc. 97), ¶ 6.) When she applied for employment at Daphne Utilities, Nettles was working as a medical assistant, a position she had held since November 2004.  (*Id.*, ¶ 4 & Exh. A.)  Nettles' resume indicated that she had previously worked for Regions Bank (first as a senior teller, then as a financial sales associate) from June 1994 to October 2003, performing various functions relating to accounting and finance, such as receiving deposits, posting loan and utility payments, processing loan applications, and performing branch audits.  (*Id.* at ¶¶ 4-5.)  Nettles did not have a college degree.  (*Id.* at ¶ 8.)  When she began working at Daphne Utilities, Nettles' starting pay was $9.39 per hour.  (*Id.*, ¶ 6.)  As Accounts Receivables Clerk, Nettles' job duties involved taking and receiving payments, posting to accounts, reconciling ledger accounts, preparing bank statements, and generally being "responsible for all monies that came through the company." (Nettles Dep. (doc. 71, Exh. 1), at 18-19.)

A mere two weeks before Nettles was hired, Pam Kellum, a white female, began working in Daphne Utilities' Accounting Department with the job title of Accounting Technician I. (Logiotatos Aff. (doc. 71, Exh. 2), ¶ 3.)  Kellum's application and resume recited more than a decade of experience in accounts receivable and accounts payable, from 1996 through 2005 and also from 1980-83 and 1984-86.  (Logiotatos Aff., ¶ 3 & Exh. B.)  These materials further revealed that Kellum had earned a four-year Bachelor of Science degree in business.  (*Id.*)[3]

---

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, Nettles' evidence is taken as true and all justifiable inferences are drawn in her favor.  Also, federal courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [Nettles'] version of the facts drawing all justifiable inferences in [her] favor."  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[3]    Nettles avers in her declaration that Kellum did not possess a college degree. (Kellum Decl., ¶ 8.)  However, plaintiff identifies no facts demonstrating personal knowledge of Kellum's educational attainment, much less that Kellum had lied on her application.  The Court therefore does not credit Nettles' assertion on this point.  *See* Rule 56(c)(4), Fed.R.Civ.P. ("An (Continued)

Kellum's starting pay at Daphne Utilities was $10.37 per hour.  (*Id.*, ¶ 3.)  As Accounting Technician I, Kellum was responsible for receiving mail, processing invoices for payments, matching purchase orders against invoices, filing accounts payable reports, and so on.  (*Id.*)  Just as Nettles was generally responsible for accounts receivable (*i.e.*, money coming in) at Daphne Utilities, so too was Kellum generally responsible for accounts payable (*i.e.*, money going out) at Daphne Utilities.  That said, Kellum also had accounts receivable duties, inasmuch as she maintained and balanced a cash receipts drawer and took customer payments.  (*Id.*)

As noted, both Nettles and Kellum were hired into the Accounting Department at Daphne Utilities.  In this regard, they both reported to Teresa Logiotatos, who was the company's Finance Manager.  (Nettles Dep., at 18.)  The only other employee assigned to that department was Logiotatos's assistant, Rebecca Williamson.  (*Id.*)  In 2007, Daphne Utilities changed the title of both Nettles' and Kellum's jobs to the singular title, Accounting Technician.  (Logiotatos Aff., ¶ 6.)  After the title change, each of Nettles and Kellum largely retained the same duties performed previously; however, they were cross-trained to perform each other's daily responsibilities.  (Nettles Dep., at 19-20.)  That way, if one Accounting Technician was out or unavailable, the other one could fill in to perform her functions.  (*Id.*)  Plaintiff's evidence is that this cross-training initiative was an unqualified success; indeed, in a performance evaluation for Nettles dated December 11, 2007, Logiotatos wrote, "Voneka is totally cross trained with the Accounts Payable function and can substitute in that position if the need arises."  (Nettles Decl., ¶ 19 & Exh. E.)[4]

Daphne Utilities utilizes a merit raise system, pursuant to which employees are awarded pay increases solely on the basis of performance, as opposed to step increases or raises linked to years of service.  (Logiotatos Aff., ¶ 2.)  As Finance Manager, Logiotatos was responsible for

_____

affidavit or declaration used to support or oppose a motion must be made on personal knowledge ….").  Besides, plaintiff makes no showing that Daphne Utilities did not reasonably understand Kellum to have a college degree, which is of course the relevant inquiry with respect to plaintiff's allegations of intentional race discrimination in compensation.

[4]      Logiotatos made a similar notation in Kellum's December 2007 performance evaluation, to-wit: "Pam has cross trained Voneka in the payable section.  Voneka can now perform that function when the need arises."  (*Id.*)

recommending merit raises for both Nettles and Kellum.  (*Id.*)  Other than 2011, in which Daphne Utilities awarded no raises (Nettles Dep., at 91), from 2006 through 2012, Nettles received a higher raise in percentage terms than Kellum did each and every year.  Moreover, in every one of those years other than 2006, Nettles' raise was larger than Kellum's in absolute dollar value.  (Logiotatos Aff., ¶ 7 & Exh. E.)  Most notably, in 2012, Nettles received a merit raise of $1.00 per hour, whereas Kellum's increase was just $0.43 per hour.  (*Id.*)  The result was that, over time, the pay differential between Nettles and Kellum (with Kellum's starting wage being $10.37 per hour, and Nettles' being $9.39 per hour) steadily eroded until, as of the end of 2012, Nettles was earning $14.39 per hour, just $0.22 (or 1.5%) less than Kellum's wage of $14.61 per hour.

On December 27, 2012, Kellum approached Nettles, her co-worker, to voice dissatisfaction with the magnitude of her newly awarded merit increase.  (Nettles Dep., at 31.)[5] During that conversation, Kellum volunteered her total hourly pay rate.  (Nettles Decl., ¶ 14.)  At that moment, Nettles first learned that she was being paid less than Kellum for what Nettles considered to be "interchangeable job duties, same job classification, same relative background experience, and basically the same date of hire."  (*Id.*)  Nettles was troubled by this revelation, but did not follow up with Logiotatos or anyone else at Daphne Utilities at that time.  (Nettles Dep., at 37.)

### B.  Plaintiff's Non-Selection for Accounts Payable Vacancy.

For her part, Kellum appears to have become distraught upon learning that her merit raise of December 2012 was much smaller than that awarded to Nettles.  On January 2, 2013, a mere six days after discussing her raise with Nettles, Kellum submitted a written resignation and walked off the job.  (Nettles Decl., ¶ 15 & Exh. D.)[6] Kellum never informed Nettles that she

---

[5]     Nettles indicates that, in Kellum's presence, Nettles opened her own paycheck, which revealed a $1.00/hour merit increase (*i.e.*, a much more substantial raise than Kellum's). (Nettles Decl., ¶ 14; Nettles Dep., at 31.)  The record is silent as to whether Nettles divulged that information to Kellum; however, plaintiff's evidence is that Kellum became aware of the size of Nettles' raise.  (Nettles Decl., ¶ 15.)

[6]     Kellum's resignation letter stated as follows: "YOU HAVE REACHED YOUR GOAL!!!!!!!! I resign my position here at Daphne Utilities Board effective today.  Pam Kellum 1/2/13."  (*Id.*)

intended to resign or spoke with her about her planned departure; rather, Nettles first learned of this development when Logiotatos told her after the fact.  (Nettles Dep., at 38-39.)

Kellum's sudden resignation created a vacant Accounting Technician position with a focus on accounts payable.  Daphne Utilities moved promptly to fill it; however, the position remained vacant for approximately three weeks in January 2013.  (Nettles Dep., at 39-40.) During this interim period, Nettles, Logiotatos and Rebecca Williamson (the other Accounting Department employee) all "pitched in" to perform what had been Kellum's job duties, with Nettles handling "the bulk" of those responsibilities.  (*Id.*; Nettles Decl., ¶ 15.)

Shortly after Kellum's resignation, Daphne Utilities posted a "Job Announcement" for the position of Accounting Technician to perform the job duties that Kellum had been assigned. (Logiotatos Aff., ¶ 8 & Exh. F.)  That Job Announcement specified that "[t]o be considered, we must receive your completed application no later than Friday, January 11, 2012 [*sic*] at 4:30 p.m."  (*Id.*)  Upon seeing the posting, Nettles approached Logiotatos.  (Nettles Dep., at 41.)  At that time, Nettles asked Logiotatos if she could perform the accounts payable job at the higher pay rate received by Kellum, with the new hire moving into the accounts receivable job that Nettles had been doing for a lower wage.  (*Id.*; Nettles Decl., ¶ 16.)  As Nettles put it, she told Logiotatos "that I would like to do it if she gave me more money."  (Nettles Dep., at 43.)[7] Plaintiff's evidence is that Logiotatos first indicated that Nettles "would have to apply for it," then later said that Nettles "couldn't apply for it because it was the same job title and classification that [she] already had."  (*Id.* at 41.)  Logiotatos explained that there would be no pay increase if Nettles transferred into the accounts payable job, particularly given that she had recently received a $1.00/hour merit increase in the accounts receivable job.  (*Id.* at 42, 44.)[8]

---

[7]      Although this testimony suggests that Nettles' interest in the accounts payable vacancy was entirely mercenary, elsewhere in her deposition she identified an additional motive, albeit one that she does not purport to have shared with Logiotatos.  In particular, Nettles testified that she viewed the accounts payable job as "a challenge" for her professionally, in that she "didn't know all the ins and outs" of the position since she "didn't do payables on a daily basis."  (*Id.* at 78.)  Logiotatos confirms that Nettles never stated that her interest in the accounts payable job was as a means of embracing a professional challenge.  (Logiotatos Aff., ¶ 9.)

[8]      Nettles also expressed to Logiotatos her hope that Daphne Utilities would not hire someone into the job at a higher rate of pay than Nettles was earning, given her seven-plus years of dedicated service to the company.  (*Id.* at 44.)  Logiotatos retorted that Nettles should not (Continued)

The statement that Nettles would not receive a raise if she transferred into the vacant job finds support in Daphne Utilities' Employee Handbook, which states that "[l]ateral job changes generally do not include a pay increase." (Doc. 71, Exh. 6 at 12.) Again, both Nettles' current job and the position vacated by Kellum bore the title "Accounting Technician."

For unknown and unspecified reasons, Nettles never applied for the vacant Accounting Technician position. (Logiotatos Aff., ¶ 8.) One candidate who did apply was a white female named Tonya Whigham. In her application, Whigham listed her work experience as including 22 years as an accounting manager at Creative Management Solutions earning a final pay of $19.50/hour, and performing accounts receivable, accounts payable, payroll, and other responsibilities; as well as two years as an accounting clerk at Crown Products performing similar duties at a wage of $14.50/hour. (Logiotatos Aff., ¶ 9 & Exh. G.) Logiotatos offered the job to Whigham at a starting pay rate of $14.70/hour (nine cents more than Kellum's final wage and 31 cents per hour more than Nettles was receiving), based on Whigham's experience and to encourage her to accept the offer, which she did. (Logiotatos Aff., ¶ 9.) In setting pay rates for new hires, Logiotatos utilized her discretion "based on the salary allocated for the position on the pay scale, taking into consideration the candidate's qualifications, education, work history and background." (*Id.*, ¶ 2.) Although both Whigham and Kellum received higher hourly wages, Nettles asserts that "we performed many of the same job functions during the course of a work week." (Nettles Decl., ¶ 28.)

Logiotatos did not consider Nettles for the vacant accounts payable position because she did not formally apply for it. Had Nettles applied, however, Logiotatos maintains that she still would have selected Whigham because (i) Whigham had far more extensive experience with accounts payable than Nettles did; (ii) Nettles' sole expression of interest in the job was that she wanted more money; (iii) Logiotatos perceived that Nettles "did not have the knowledge to get the job done" during the recent all-hands-on-deck period in which the accounts payable position was unoccupied; and (iv) Logiotatos was concerned that Nettles may not honor the

---

expect someone to leave a job to come work at Daphne Utilities for less money than that person had been earning previously. (*Id.* at 45.)

confidentiality that the accounts payable position requires, given Nettles' recent off-limits conversation with Kellum divulging raises and rates of pay. (Logiotatos Aff., ¶ 9.)[9]

## II.     Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the

---

[9]     Plaintiff points to two Daphne Utilities policies that she contends should have factored into the hiring decision.  The first is a transfer policy, which reads in part as follows: "After completing six months of continuous employment, employees may apply for a transfer or be promoted to a vacant position.  Prior performance, skills, knowledge, experience, education, ability to perform the job and recommendation form the employee's current department manager will be considered in making promotion and transfer decisions."  (Nettles Decl., ¶ 24 & Exh. E.) The second is a promotion policy, which states, "While Daphne Utilities will strive to promote from within, Daphne Utilities has the discretion to fill job vacancies from outside if deemed necessary."  (*Id.*)

summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted); *see also Williamson v. Clarke County Dep't of Human Resources*, 834 F. Supp.2d 1310, 1318 (S.D. Ala. 2011) (recognizing and applying rule that summary judgment standard is applied equally in employment discrimination cases as in other kinds of federal actions).

**III.   Analysis.**

      *A.   The* **McDonnell Douglas** *Standard.*

      Absent direct evidence of discrimination, Nettles must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[10]  Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination.  If she does so, that showing "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).  At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. ... If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (outlining similar procedure for Title VII retaliation

---

[10]      Although plaintiff's claims are nominally brought under Title VII, 42 U.S.C. § 1981 and 42 U.S.C. § 1983, both sides properly recognize that the applicable legal standard is identical (doc. 70, at 14, doc. 96, at 8-10).  *See, e.g., Brown v. Alabama Dep't of Transportation*, 597 F.3d 1160, 1174 n.6 (11th Cir. 2010) ("The analysis under [§ 1981] claims mirrors that under Title VII."); *Rice-Lamar v. City of Fort Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a section 1983 claim of race or gender discrimination are the same as the elements of a Title VII disparate treatment action. … The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context."); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("Section 1983 serves as a basis for relief for violations of federal law under color of state law.  Insofar as it is used as a parallel remedy for transgression of section 1981 and section 706 of Title VII rights, the elements of the causes of action do not differ …."); *Brown v. School Bd. of Orange County, Florida*, 459 Fed.Appx. 817, 819 (11th Cir. Feb. 28, 2012) ("Title VII and § 1981 have the same requirements of proof and utilize the same analytical framework.").  The parties have not argued that the analysis differs for any of the various species of claims that Nettles is asserting, save for the due process claim (nominally recited in the Amended Complaint) which she now disclaims any intent to pursue.  (*See* doc. 100.)

claims).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11ᵗʰ Cir. 2006) (quotation omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11ᵗʰ Cir. 2007).

> **B.**     ***Wage Discrimination Claims (Counts I and II).***

In Counts I and II of the Amended Complaint, Nettles asserts claims of compensation discrimination pursuant to Title VII, 42 U.S.C. § 1981 and 42 U.S.C. § 1983.  Defendant now moves for summary judgment on these causes of action, reasoning that Nettles cannot make out a *prima facie* case.  Specifically, Daphne Utilities argues that Nettles has failed to meet her burden of identifying an appropriate comparator.  (*See* doc. 70, at 17-19.)[11]

To establish a *prima facie* case of intentional compensation discrimination based on race, Nettles must show that: (i) she belongs to a racial minority; (ii) she received low wages; (iii) similarly situated comparators outside the protected class received higher compensation; and (iv) she was qualified to receive the higher wage.  *See Cooper v. Southern Co.*, 390 F.3d 695, 735 (11ᵗʰ Cir. 2004); *Hill v. Emory University*, 346 Fed.Appx. 390, 395 (11ᵗʰ Cir. Aug. 25, 2009). Daphne Utilities focuses its argument on the third of these elements, maintaining that "[t]he comparators [Nettles] has identified, Pam Kellum and Tonya Whigham, are not similarly situated to her."  (Doc. 70, at 18.)

The appropriate starting point of the analysis is to examine what is meant by the phrase "similarly situated comparators" in the Title VII wage discrimination context.  Daphne Utilities

---

[11]     This argument is the sole ground for dismissal of Counts I and II identified in Daphne Utilities' principal brief; therefore, the Motion for Summary Judgment as to the wage discrimination claims stands or falls on whether Nettles has made a sufficient showing of comparators to satisfy her *prima facie* burden.  Defendant points to no record evidence showing how it selected the initial wages for Nettles and comparator Pam Kellum; therefore, the Court would be unable to proceed with the second and third steps of the *McDonnell Douglas* analysis even if it were inclined to do so *sua sponte*, simply because the requisite evidence has not been presented.  Of course, the Court cannot speculate as to why Daphne Utilities paid Nettles and Kellum the wages that it did.

proposes that "[t]he comparator must be nearly identical to the plaintiff," a proposition for which it cites *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). (Doc. 70, at 18.) The flaw in defendant's reasoning is that *Wilson* was not a wage discrimination case; to the contrary, the cited excerpt from that decision is drawn from a discussion of the plaintiff's discriminatory discharge claim. The distinction matters. By adopting the "nearly identical" test in *Wilson*, the Eleventh Circuit adhered to a line of precedent recognizing that in cases alleging discriminatory discipline or application of work rules, the misconduct at issue must be nearly identical to avoid judicial second-guessing of an employer's decision to impose different discipline for different misconduct.[12]

By contrast, in Title VII or § 1981 wage discrimination claims, the Eleventh Circuit has applied a more relaxed, less stringent standard for the "similarly situated comparator" element of a plaintiff's *prima facie* case.[13] "The comparators must perform jobs similar to the plaintiff's; thus, the plaintiff must show that, in her job, she shared the same type of tasks as the comparators." *Cooper*, 390 F.3d at 735 (citation and internal quotation marks omitted); *see also Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992) (in Title VII

---

[12]     *See, e.g., Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed. In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.") (citation and internal quotation marks omitted); *Vega v. Invsco Group, Ltd.*, 432 Fed. Appx. 867, 870 (11th Cir. June 24, 2011) ("We have explained that, particularly in cases involving employee discipline or misconduct, the individual that the plaintiff identifies as her comparator must be similarly situated in all relevant respects and that the comparator's misconduct must be nearly identical to the plaintiff's.") (citations, emphasis and internal quotation marks omitted).

[13]     *See, e.g., Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 598 (11th Cir. 1994) ("[t]he standard for 'similarity' in Title VII cases is relaxed" in wage discrimination context); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992) ("[u]nder the disparate treatment approach of Title VII, … there is a relaxed standard of similarity between male and female-occupied jobs"); *Blackman v. Florida Dep't of Business and Professional Regulation*, ---Fed.Appx. ----, 2015 WL 689622, *5-6 (11th Cir. Feb. 19, 2015) (applying "Title VII's relaxed standard of similarity" to claims of pay discrimination); *Sharpe v. Global Sec. Int'l*, 766 F. Supp.2d 1272, 1294-95 (S.D. Ala. 2011) ("In the context of a wage discrimination claim brought under Title VII …, the 'similarly situated' criterion is interpreted less stringently" than it is in other types of claims).

pay discrimination case, plaintiff established *prima facie* case by showing "that the job she occupied was similar to higher paying jobs occupied by males" where her evidence "established that she shared the same type of tasks" as comparators).[14]  This *Miranda* test, and not the "nearly identical" formulation championed by Daphne Utilities, governs Nettles' pay discrimination claims set forth in Counts I and II of the Amended Complaint.[15]

Under the *Miranda* line of authorities, the focal point of the comparator analysis is the job, not the person, and the standard of proof is not stringent.  *See E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1569-70 (11th Cir. 1993) (in Title VII wage discrimination claim, plaintiff can satisfy *prima facie* burden by showing "that the job she occupied was similar to higher paying jobs occupied by males," and "Title VII affords a plaintiff a less stringent standard of proof on the similarity of the jobs" than Equal Pay Act); *White v. ThyssenKrupp Steel USA, LLC*, 743 F. Supp.2d 1340, 1344 (S.D. Ala. 2010) ("*Miranda* demonstrates that the substantial similarity element, for purposes of a compensation claim under Title VII (and thus Section 1981), is limited to a comparison of job similarity.").[16]  In accordance with these principles, then, a black plaintiff makes a *prima facie* showing of wage discrimination by showing that she "received lower wages than a white co-worker despite performing substantially the same work."  *Lindsey v. Board of School Com'rs of Mobile County*, 491 Fed.Appx. 8, 10

---

[14]     *See also Mulhall*, 19 F.3d at 598 (for purposes of wage discrimination claim, plaintiff can "make a Title VII *prima facie* case on a showing that she is [black] and her job was substantially similar to higher paying jobs occupied by [whites]"); *Sharpe*, 766 F. Supp.2d at 1295 (in Title VII context, "a plaintiff satisfies his *prima facie* burden of comparability simply by showing that he 'occupies a job similar to that of higher paid' persons outside the protected class") (citing *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)).

[15]     *See, e.g., Youngblood v. George C. Wallace State Community College*, 2014 WL 2961085, *12-13 (M.D. Ala. July 1, 2014) (rejecting "nearly identical" comparator test in Title VII pay discrimination context as being in direct conflict with *Miranda* and the result of a misreading of *Wilson*); *Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054, *13 & n.35 (S.D. Ala. Apr. 11, 2011) (decrying use of "nearly identical" test in Title VII wage discrimination context as contrary to binding precedent).

[16]     These principles dovetail neatly with the more general observation that "the plaintiff's *prima facie* burden is not onerous."  *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769 (11th Cir. 2005); *see also Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) ("a plaintiff's burden in proving a *prima facie* case is light").

(11th Cir. Sept. 25, 2012).  A comparator is valid when plaintiff and comparator "largely performed similar tasks at work during the relevant periods."  *Id.*

To satisfy her burden of making a *prima facie* showing as to the comparator element, Nettles comes forward with evidence that, accepted as true for summary judgment purposes, demonstrates that she largely performed similar tasks at work as did Pam Kellum and Tonya Whigham.  Each of Nettles and her comparators was classified by Daphne Utilities as an Accounting Technician, with the same pay grade and job description.  Each worked in the same department and reported to the same supervisor.  Each was responsible for processing financial information and documentation, and for maintaining financial records on behalf of Daphne Utilities.  To be sure, Nettles' Accounting Technician position was focused on the accounts receivable function, while that held by Kellum and Whigham was oriented toward the accounts payable function.  That difference (on which Daphne Utilities seizes for summary judgment purposes) demonstrates that the jobs were not identical; however, substantial similarity (rather than near-identity) is all that is required.  In that regard, Nettles avers that, notwithstanding this difference, "the two accounting jobs were very similar and required the same skill, effort and responsibility and were performed under similar working conditions."  (Nettles Decl., ¶ 10.)  Nettles also presents evidence that Daphne Utilities expected the occupant of one Accounting Technician job to be able to perform the functions of the other, and that each employee was cross-trained for that purpose.  (*Id.*, ¶¶ 10-11.)  According to Nettles, she, Kellum and Whigham "performed many of the same job functions during the course of a work week."  (*Id.*, ¶ 28.)

The bottom line is this:  Daphne Utilities' summary judgment argument as to Counts I and II would demand that Nettles' job duties be nearly exactly the same as those of her comparators in order to establish a *prima facie* case of wage discrimination.  Eleventh Circuit precedent is clear, however, that such exactitude and precision is not required of a plaintiff in these circumstances.  To the contrary, the legal standard for comparators in the Title VII wage discrimination context is more relaxed, requiring only that Nettles show her job was "similar" to that of her comparators and that they "shared the same type of tasks."  Plaintiff's evidence is that, at Daphne Utilities, one Accounting Technician job was "similar" to the other in terms of skill, effort, responsibility, working conditions and duties, and that Nettles performed many of the same job functions as did Kellum and Whigham.  Because Nettles has shown that she largely performed similar tasks at work for lower pay than white co-workers received during the relevant

time period, the Court concludes that defendant's Motion for Summary Judgment is not well taken insofar as it attacks the comparator element of Nettles' *prima facie* case of wage discrimination.  No other ground for dismissal of Counts I and II is articulated in Daphne Utilities' principal brief; therefore, the Rule 56 Motion will be **denied** as to Counts I and II.

> ### C.     Discriminatory Failure to Transfer Claims (Counts III and IV).

In Counts III and IV of the Amended Complaint, Nettles brings claims under Title VII, § 1981 and § 1983 alleging race discrimination by Daphne Utilities in "refusing to hire/transfer/ promote Plaintiff Nettles to the position vacated by Ms. Kellum."  (Doc. 6, ¶¶ 51-52.)  Defendant moves for summary judgment on these claims on the grounds that Nettles cannot establish a *prima facie* case and, even if she could, plaintiff cannot show that Daphne Utilities' stated reasons for the challenged personnel decision are pretextual.

The parties are in agreement that Nettles' *prima facie* burden as to these claims requires her to show each of the following: (i) she is a member of a protected class; (ii) she is qualified and applied for the position; (iii) she was rejected despite her qualifications; and (iv) other equally or less qualified employees who were not members of the protected class were promoted. (*See* doc. 70, at 19; doc. 96, at 12.)[17]  Daphne Utilities argues that Nettles' proof falls short as to the second element because she did not apply for the posted Accounting Technician position.  In response, plaintiff concedes that she did not apply; however, she invokes the futility exception to this requirement.  Under that doctrine, "a non-applicant may nonetheless establish a *prima facie* case by showing that she refrained from applying due to a justifiable belief that the employer's discriminatory practices made application a futile gesture."  *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1274 (11th Cir. 2002) (citations omitted); *see also July v. Board of School Com'rs*, 2013 WL 4854130, *4 (S.D. Ala. Sept. 11, 2013) (same).  This in turn requires the non-

---

[17]     This formulation of the *prima facie* case finds ample support in the caselaw.  *See, e.g., Brown*, 597 F.3d at 1174 ("In the failure-to-promote context, the *prima facie* case consists of showing these elements: (1) that the plaintiff belongs to a protected class; (2) that she applied for and was qualified for a promotion; (3) that she was rejected despite her qualifications; and (4) that other equally or less-qualified employees outside her class were promoted."); *Oliver v. National Beef Packing Co.*, 294 Fed.Appx. 455, 458 (11th Cir. Sept. 18, 2008) ("To establish a *prima facie* case of race discrimination for a failure to promote claim, a plaintiff may show: (1) he was a member of a protected class; (2) he was qualified and applied for the promotion; (3) he was rejected despite his qualifications; and (4) the employer continued to seek applicants for the position or promoted another employee who was not a member of the protected class.").

applicant to demonstrate, *inter alia*, "that she would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices." *Joe's Stone Crabs*, 296 F.3d at 1274.

The trouble with Nettles' invocation of this futility exception is that she presents no evidence to support it. To be sure, plaintiff avers that her supervisor, Teresa Logiotatos, made various comments (*i.e.*, that Nettles would have to apply for the job, that Nettles could not apply for the job, that Nettles would not receive a pay increase if she got the job, that the job required confidentiality, etc.) which Nettles perceived as discouraging her from pursuing the accounts payable position. (Nettles Decl., ¶¶ 16-17.) But nowhere does plaintiff assert (in her Declaration or anywhere else) that Logiotatos's statements caused her not to apply for the vacant Accounting Technician job. We simply do not know why Nettles failed to submit an application for the posted position, because she has not told us.[18] The Court cannot guess as to what her reasons were. Thus, Nettles has not satisfied the application element of her *prima facie* case for Counts III and IV, and has not made an adequate showing of the alternative "futility" means of

---

[18]     Even if Nettles had linked Logiotatos's remarks to her failure to apply for the job, the futility exception would remain unavailable because she has not connected those comments to "the employer's discriminatory practices." In advising Nettles that she would not receive a raise if she were transferred to the accounts payable job formerly held by Kellum, Logiotatos was accurately reciting a Daphne Utilities policy that is nondiscriminatory on its face. Recall that Nettles was already classified as an Accounting Technician, albeit one with an accounts receivable focus. The vacant job was also an Accounting Technician job, and therefore constituted a lateral transfer, not a promotion. Daphne Utilities had a written policy that "[l]ateral job changes generally do not include a pay increase." (Doc. 71, Exh. 6 at 12.) There appears to be nothing discriminatory about either maintaining such a policy, or applying it in Nettles' case; therefore, plaintiff cannot show that her failure to apply for the vacancy was because of "discriminatory practices." Moreover, the record specifies that Nettles' primary motivation for wanting Kellum's job was to make more money. The company policy against wage increases for lateral transfers meant that Nettles would not achieve that objective if she got the job, thereby eliminating her incentive to apply. It appears, then, that Nettles may have been deterred from seeking the job not because of a discriminatory practice, but because a published Daphne Utilities policy against raises for lateral transfers eliminated her reason for wanting the job in the first place. This circumstance weighs against Nettles' ability to establish a *prima facie* case of discriminatory non-promotion based on the futility exception.

establishing same.  Because Nettles has not established a *prima facie* case of discriminatory failure to promote / transfer, Counts III and IV are properly dismissed.[19]

Even if Nettles had met her burden of showing a *prima facie* case (and she has not), she still would not prevail in the *McDonnell Douglas* analysis.  Daphne Utilities has met its modest burden of coming forward with a legitimate nondiscriminatory reason for its non-selection of Nettles for the accounts payable position.  In fact, Daphne Utilities has identified multiple reasons for the challenged decision, to-wit:  (i) Nettles did not apply for the job; (ii) the successful applicant (Tonya Whigham) had far more accounts payable experience than Nettles did, for what was primarily an accounts payable job; (iii) Nettles' supervisor  (Logiotatos) observed that Nettles lacked "the knowledge to get the job done when the position was vacant" as Nettles pitched in to cover Kellum's job duties; and (iv) Logiotatos further had reservations about Nettles' ability to honor the confidentiality requirements of the job, given Nettles' demonstrated poor judgment in conversing with a co-worker about their respective salary and raises just a few weeks earlier.  (Logiotatos Aff., ¶ 9.)

Daphne Utilities having expressed legitimate nondiscriminatory reasons for Nettles' non-selection, it becomes incumbent on plaintiff to demonstrate pretext.  "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual."  *Chapman v. AI*

_____

[19]      On summary judgment, Nettles argues that she can make out a *prima facie* case because "management failed to allow her the benefit of the company's transfer rule" and failed to honor its policy of promoting from within.  (Doc. 96, at 14-15.)  These contentions misstate the applicable policies.  Daphne Utilities' "transfer rule" does not bestow on employees an absolute right to be transferred to any vacant position of their choosing after six months on the job.  Rather, the policy simply states that such "employees may apply for a transfer," subject to management consideration of factors such as performance, skills, knowledge, experience, education, ability and so on.  (*See* Nettles Decl., ¶ 24 & Exh. E.)  Likewise, Daphne Utilities' promotion policy does not mandate promotion from within, but merely provides as follows: "While Daphne Utilities will strive to promote from within, Daphne Utilities has the discretion to fill job vacancies from outside if deemed necessary."  (*Id.*)  Plaintiff has produced no evidence raising a reasonable inference that "Daphne Utilities failed to adhere to its policies" or engaged in "deviation from usual hiring policy" as to either of these provisions.  (Doc. 96, at 14-15.)  Rather, Daphne Utilities' failure to transfer Nettles to the vacant Accounting Technician position is entirely consistent with those policies.  Daphne Utilities routinely requires interested employees to apply for any position for which they seek transfer and to compete with all other internal and external applicants.  (Lyndall Aff. (doc. 112, Exh. 2), ¶ 2.)

*Transport*, 229 F.3d 1012, 1037 (11ᵗʰ Cir. 2000).  To show that a stated reason is pretext for unlawful discrimination, the plaintiff "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11ᵗʰ Cir. 2005) (quotation omitted).[20]  "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. … Quarreling with that reason is not sufficient." *Wilson*, 376 F.3d at 1088.   Additionally, "[i]f the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."  *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11ᵗʰ Cir. 2007).

Nettles' pretext argument is twofold.  First, although she admits (as she must) that "Whigham had extensive accounts payable experience," Nettles maintains that she "had to train [Whigham] on the duties of the accounts payable" job and that Whigham "apparently did not have the know-how to 'hit the ground running'" at Daphne Utilities.  (Doc. 96, at 16.)[21]  This argument is unpersuasive.  There is no perceptible inconsistency in the scenario that Nettles describes.  To say that a successful applicant is highly experienced and the most qualified person for a job in no way conflicts with that applicant requiring training as to specific functions of the job at the particular workplace.  Stated differently, of course Whigham required training when she began working at Daphne Utilities.  After all, she did not (and could not) know about company-specific practices, protocols and procedures until she began working there.  That fact in no way undercuts, undermines or calls into question the reasonableness of Daphne Utilities' business judgment that Whigham was the most qualified applicant for the accounts payable position, by virtue of her 20+ years of relevant experience.  Second, Nettles endeavors to show

---

[20]     *See also Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11ᵗʰ Cir. 2010) (plaintiff may satisfy burden of showing pretext "by showing that [defendant's] proffered reasons are not credible"); *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11ᵗʰ Cir. 2008) ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons.").

[21]     On this point, Nettles avers that Logiotatos "requested that [Nettles] train Whigham in the Accounts Payable duties, as they relate to this public utility," and that Nettles complied because she is a "cooperative individual."  (Nettles Decl., ¶ 21.)

-16-

pretext by claiming that, as a matter of company policy, she had a right to be transferred to the position. (Doc. 96, at 16.)  No evidence supports such a conclusion.  To be sure, Daphne Utilities' transfer policy would have allowed Nettles to apply and be considered for that job; however, it would in no way curtail Daphne Utilities' discretion to select whichever candidate it deemed most qualified.  Thus, plaintiff's attempt to establish pretext by showing that Daphne Utilities failed to adhere to its own policies lacks a record basis.

In light of the above, the Court concludes that Nettles has failed to meet her burden of demonstrating such weaknesses and implausibilities in defendant's stated nondiscriminatory reasons for not transferring her into the accounts payable job that a reasonable factfinder might deem them unworthy of credence.  In particular, Daphne Utilities has shown that Nettles was required to apply for the job in order to be considered, but that she never did so.  It has shown that Logiotatos reasonably viewed Whigham to be more qualified for the job than Nettles was because of Whigham's extensive accounts payable experience.  It has shown that the company did not wish to transfer Nettles to a highly sensitive accounts payable position given her demonstrated inability to perform the job fully after Kellum resigned and Logiotatos's reasonable concerns about Nettles' ability to preserve confidential information.  On this record, a reasonable factfinder could not conclude that Daphne Utilities' stated reasons for not transferring Nettles into a vacant Accounting Technician position in January 2013 were a pretext, and that the real reason was Nettles' race.  Summary judgment is appropriate on Counts III and IV.

### D.       Limitations Issue.

As an additional ground for its Motion for Summary Judgment, Daphne Utilities seeks to narrow the relevant time period for any back pay award that Nettles might receive with respect to the discriminatory compensation claims found in Counts I and II.  (*See* doc. 70, at 22-24.) Plaintiff has neither responded to this argument nor contested this point.

In particular, Daphne Utilities points to statutory authority that "liability may accrue and an aggrieved person may obtain … recovery of back pay for up to two years preceding the filing of the charge."  42 U.S.C. § 2000e-5(e)(3)(B).  The record reflects that Nettles filed an EEOC Charge of Discrimination complaining about discriminatory pay practices at Daphne Utilities on June 21, 2013.  (Doc. 71, Exh. 4.)  As such, for purposes of her Title VII claim for wage discrimination, Nettles may only recover back pay dating back to **June 21, 2011**, or two years before she filed her EEOC Charge.  Similarly, Daphne Utilities has argued without opposition

from plaintiff that Nettles' back pay claim relating to her wage discrimination claim under 42 U.S.C. §§ 1981 and 1983 is subject to a two-year statute of limitations, such that a two-year back pay limit for that aspect of her wage discrimination claims is likewise appropriate. Accordingly, insofar as Nettles seeks back pay under Title VII, 42 U.S.C. § 1981 or 42 U.S.C. § 1983 for alleged wage discrimination predating that two-year look-back period, the Motion for Summary Judgment will be **granted**.[22]

## IV.    Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.     Defendant's Motion for Summary Judgment (doc. 69) is **granted in part**, and **denied in part**;

2.     Plaintiff Voneka Nettles' claims of discriminatory failure to hire/transfer/promote (Counts III and IV) are **dismissed** because there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law;

3.     Plaintiff Nettles' claim of due process violations embedded in her wage discrimination claim (Count II) is **dismissed** because Nettles has acknowledged that she is not pursuing such a claim;

4.     The Motion for Summary Judgment is **denied** as to Count I (wage discrimination in violation of Title VII) and all other aspects of Count II (wage discrimination in violation of 42 U.S.C. §§ 1981 and 1983);

5.     The Motion for Summary Judgment is **denied** as to punitive damages because the Amended Complaint reflects that no such damages are sought herein; and

6.     Plaintiff Nettles' claims for back pay in Counts I and II are limited to the period commencing on June 21, 2011, exactly two years before she filed her EEOC Charge complaining of wage discrimination.

---

[22]     Also in its principal brief, Daphne Utilities contends that it is entitled to judgment as a matter of law on "any claim for" punitive damages that Nettles is asserting. (Doc. 70, at 22.) The Amended Complaint is devoid of any reference to punitive damages; rather, the *ad damnum* clause requests that Nettles be awarded a declaratory judgment; $300,000 in compensatory damages; back pay and benefits for the period of time in which she was paid less than similarly situated white employees; and costs and fees. (Doc. 6, at 10-11.) As the Amended Complaint lacks any indication that punitive damages are being sought, Daphne Utilities' Motion for Summary Judgment is **denied** insofar as it seeks dismissal of a nonexistent element of damages.

DONE and ORDERED this 24th day of March, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE