IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| VONEKA Q. NETTLES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 13-0605-WS-C |
| | ) |
| DAPHNE UTILITIES, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

A non-jury trial was held in this matter on July 30, 2015.  Pursuant to Rule 52(a)(1), Fed.R.Civ.P., the Court now finds the facts specially and states its conclusions of law separately.

**I.    Nature of the Case.**

This employment discrimination action was brought by Voneka Nettles against her former employer, Daphne Utilities.  As set forth in the Joint Pretrial Document (doc. 126), Nettles' sole claim for relief is that Daphne Utilities discriminated on the basis of her race (African-American) by paying her lower wages than two Caucasian employees, Pam Kellum and Tonya Whigham, who performed a substantially similar job.  The Joint Pretrial Document reflects that Nettles' wage discrimination claim against Daphne Utilities is asserted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981, made actionable by 42 U.S.C. § 1983.  For its part, Daphne Utilities denies that Nettles' race was a motivating factor in its decision to pay her a lower hourly wage than Kellum or Whigham, and maintains that there were valid nondiscriminatory reasons for the pay disparity.

The triable issues of law and fact joined in this matter are confined to those delineated in the Joint Pretrial Document, as incorporated in the Order on Pretrial Conference (doc. 132).  To the extent that any party argues for adjudication in its favor of a triable claim or defense not identified in the Joint Pretrial Document, that argument is rejected because, as the Court previously explained, the Joint Pretrial Document "shall constitute the final statement of the issues involved in this action, govern the conduct of the trial, and form the basis for any relief

afforded by the Court." (Doc. 132, at 1-2.)[1]  In resolving such triable issues, the Court has reviewed and considered the following: (i) all witness testimony and exhibits admitted into evidence at the bench trial conducted on July 30, 2015; and (ii) the parties' post-trial briefs (docs. 180 & 182) relating to Defendant's Motion for Judgment as a Matter of Law (doc. 178).[2]

## II.  Findings of Fact.

### A.  *Defendant's Hiring and Initial Pay Rate Decisions for Plaintiff.*

Daphne Utilities hired Voneka Nettles on August 1, 2005 for the position of Accounts Receivable Clerk.  The hiring decision was made by Teresa Logiotatos, who was (and still is) the Finance Manager for Daphne Utilities.  At that time, Nettles was employed as a medical assistant for Eastern Shore Family Practice, earning $8.20 per hour.  Logiotatos did not consider Nettles'

---

[1]  The Order on Pretrial Conference elaborates that "[d]ispositive legal issues that are not contained in the parties' Joint Pretrial Document, or in any amendments to that document expressly permitted by order of the Court, will not be considered." (*Id.* at 2.)

[2]  The Motion for Judgment as a Matter of Law is **denied** for both technical and practical reasons.  The technical reason is that it was incorrectly brought pursuant to Rule 50(a), Fed.R.Civ.P., which applies only to jury trials, rather than Rule 52(c), Fed.R.Civ.P., which applies to non-jury trials. *See, e.g., Hepsen v. Resurgent Capital Services, LP*, 383 Fed.Appx. 877, 884 (11th Cir. June 17, 2010) ("As the Court has explained and as Rule 50 clearly states, a Rule 50 motion applies only in civil cases tried to a jury."); *Smith v. Haden*, 872 F. Supp. 1040, 1043 (D.D.C. 1994) ("By its terms Rule 50 only applies in cases tried to a jury. … Therefore, it is not appropriate to make a Rule 50 motion in a bench trial or for the Court to rule on such a motion.").  The practical reason is that the most compelling aspects of defendant's Motion hinge on a selective reading of facts presented at trial that necessarily requires judicial fact-finding. While Rule 52(c) authorizes district courts in non-jury trials to issue judgment on partial findings, it does not require them to do so, but instead allows district courts to "decline to render any judgment until the close of the evidence."  Rule 52(c), Fed.R.Civ.P.  Under the circumstances presented here, the difference between tackling the merits of a Rule 52(c) motion at the close of all the evidence and issuing Rule 52(a) findings of fact and conclusions of law appears to be largely one of semantics.  There is no material difference between entering a judgment pursuant to Rule 52(a) and doing so under Rule 52(c) at the close of all the evidence; rather, the Motion for Judgment as a Matter of Law would entail the functional equivalent of the Rule 52(a) protocol that this Court must follow anyway. *See generally Bowen v. Celotex Corp.*, 292 F.3d 565, 566 (8th Cir. 2002) ("A district court must make credibility determinations and findings of fact under both Rule 52(a) and Rule 52(c) …, so the district court would have likely written a nearly identical opinion had it nominally proceeded under Rule 52(c).").  So the Motion is unnecessary.  Notwithstanding the denial of defendant's Rule 50(a) Motion, the Court has considered – and this Order does take into account – the various legal and factual arguments presented by the parties in their post-trial briefs.

medical experience to be relevant to the Accounts Receivable Clerk job; however, Nettles had previously spent more than nine years as a bank teller (including accounting duties) and financial sales associate at Regions Bank. Logiotatos did deem Nettles' teller experience to be relevant and helpful in the hiring decision. Nothing in Nettles' educational background (high school diploma, with additional study in the fields of medical assistant and marketing) stood out to Logiotatos as bearing on her qualifications and ability to perform the Accounts Receivable Clerk job.

Logiotatos was also responsible for setting Nettles' initial rate of pay as Accounts Receivable Clerk. In making this determination, Logiotatos considered the pay range and job duties for the position, as well as Nettles' education, experience and salary level at her previous job. To Logiotatos, the salary history variable is significant because, in her experience, job applicants may be less likely to accept an offer of employment if the starting pay does not exceed what they had been earning previously. After considering all of these factors, Logiotatos selected a starting pay rate of $9.39 per hour, representing a $1.19 hourly increase above what Nettles was earning in her medical assistant position. Logiotatos did not consider Nettles' race in fixing her starting rate of pay. Nettles accepted the job offer and began working for Daphne Utilities in August 2005.

### B.     *Plaintiff's Duties, Job Performance and Pay Raises.*

As Accounts Receivable Clerk, Nettles' primary job duties consisted of waiting on and taking payments from Daphne Utilities customers at both a lobby counter and a drive-through window. Nettles was responsible for processing customer payments, whether made by cash, check, credit card or electronic transfer. She was also required to post receivable batches, reconcile her cash drawer at the end of her shift, and prepare a daily cash deposit report. These primary job duties (focused on the accounts receivable function) remained constant for Nettles from the time she began working at Daphne Utilities in 2005 through the filing of her EEOC Charge against defendant in June 2013.[3]

---

[3] This is so, despite the fact that Daphne Utilities modified her job title from Accounts Receivable Clerk to Accounting Technician at some point. Neither Nettles' primary duties nor her accounts receivable focus changed after her position was reclassified to Accounting Technician.

The Finance Department at Daphne Utilities was a small department, consisting of Logiotatos (Finance Manager), Nettles (Accounts Receivable Clerk), Pam Kellum (Accounting Technician I, responsible for the accounts payable function), Rebecca Williamson (Accounting Assistant), and a customer service representative. In order to minimize disruption to department operations when one or more employees happened to be out of the office, Logiotatos considered employee cross-training to be a high priority. Thus, Nettles was cross-trained in accounts payable functions, and Kellum – her counterpart who performed the accounts payable job – was cross-trained in accounts receivable duties. Notwithstanding Logiotatos's cross-training initiative, however, Nettles' day-to-day responsibilities were squarely focused on the accounts receivable function, and Kellum directed most of her time and efforts to the accounts payable function. In other words, the mere fact of cross-training did not erase or blur the distinction between the accounts receivable job (held by Nettles) and the accounts payable job (held by Kellum), nor did it yield a situation where those two employees interchangeably performed each other's duties on a day-in, day-out basis. At all relevant times, Nettles' primary function and focus at Daphne Utilities lay in the area of accounts receivable, not accounts payable. Even when Kellum was away from the office, Nettles' duties remained centered on accounts receivable.

During the relevant time period, Nettles consistently performed her duties for Daphne Utilities at a high level. She received uniformly favorable annual performance evaluations. Indeed, Logiotatos felt that Nettles was a very good employee, thought highly of her efforts, and believed that Nettles' performance in her primary job was excellent.[4] Nettles had no performance issues of any kind during the relevant time period. Consequently, in each year except for 2011 (when Daphne Utilities awarded no increases to any employees), Nettles received a substantial pay raise as recommended by Logiotatos. In particular, Nettles received a $1.21 merit increase in December 2006, an $0.80 merit increase in December 2007, a $0.70 merit increase in December 2008, a $0.60 merit increase in December 2009, a $0.69 merit

---

[4] Logiotatos was not alone at Daphne Utilities in praising Nettles' performance. On at least two occasions, Rob McElroy, then the utility's general manager, sent handwritten notes to Nettles recognizing her excellent work and her integral role in the utility's success.

increase in December 2010, and a $1.00 merit increase in December 2012, raising her total hourly wage to $14.39 at that time.

   C. *Defendant's Hiring and Pay Decisions as to Pam Kellum.*

   In July 2005, mere weeks before Nettles arrived, Daphne Utilities hired a Caucasian female named Pam Kellum for the vacant position of Accounting Technician I. This job was the accounts payable position in the Finance Department, supervised by Logiotatos.[5] Kellum's primary job duties included matching purchase orders with invoices after products were received, entering vendor transactions into the computer, verifying account numbers, printing and distributing vendor checks, and the like. In brief, when Daphne Utilities receives a vendor invoice, the accounts payable technician (*i.e.*, Kellum) was responsible for collecting all supporting documentation from within the utility, obtaining necessary signatures approving and authorizing payment for the invoice, issuing checks for payment of such invoice in a timely manner (before finance charges accrue), tracking and reconciling inventory, and preparing and reviewing appropriate reports. At any given time, the accounts payable employee juggles numerous invoices simultaneously, seeking to ensure that they are paid in a timely and correct manner.[6] The accounts payable employee also assists with the receivables function by maintaining a cash drawer and waiting on customers in the lobby as needed.

   Logiotatos selected an initial hourly wage for Kellum of $10.37 per hour, or $0.98 higher than Nettles' starting pay rate, even though both began working at Daphne Utilities at almost exactly the same time. Logiotatos based her decision as to Kellum's starting pay on various nondiscriminatory factors, including Kellum's relevant work history (reflecting more than a decade's worth of accounting experience, including accounts payable, accounts receivable, reconciliation, payroll, inventory), her educational background (a bachelor of science degree in

---

[5] Later, Daphne Utilities reclassified this position with the title "Accounting Technician." Kellum's job duties and, specifically, her orientation toward the accounts payable function, remained the same despite this modification in her job title.

[6] At trial, Logiotatos colorfully characterized the accounts payable job as "chasing paper" and indicated that the employee performing those duties at Daphne Utilities faces a "continuous, everyday fight" to complete such tasks. There was also testimony that the employee performing the accounts payable function may need one to two weeks to process a single invoice, whereas the accounts receivable technician typically completes each transaction within a couple of minutes.

business), and her rate of pay at her prior job ($10.00 per hour, such that Logiotatos adhered to her practice of offering a little bit more to the applicant to entice her to accept employment at Daphne Utilities). Logiotatos also expressly considered the duties of the position for which Kellum was being hired. In that respect, Logiotatos viewed the accounts payable job that Kellum was being offered as more detailed, more complicated, more time-consuming, more tedious, and more difficult than the accounts receivable position held by Nettles. Indeed, Logiotatos reasonably deemed the accounts payable function to demand more skill, more effort, and more responsibility than the accounts receivable function. Nor was this perception confined to Logiotatos. Daphne Utilities had always compensated its accounts payable clerk more highly than its accounts receivable clerk. This state of affairs was not new, and it did not commence with Nettles' arrival at the utility in August 2005.[7]

Logiotatos considered Kellum to be a good employee, at least until Kellum abruptly resigned from Daphne Utilities without notice in January 2013. There is evidence that Kellum's merit increase in December 2012 was smaller than Nettles'; however, the trial record discloses neither the amount of Kellum's annual raises nor her specific pay history at Daphne Utilities beyond her starting hourly rate of $10.37.[8]

---

[7] Nettles challenges Logiotatos's credibility on this point by testifying about a conversation concerning pay rates if Nettles were to apply for the accounts payable job vacated by Kellum in January 2013. The Court makes a factual finding, however, that Logiotatos never told Nettles that no raise was available if she were transferred to the accounts payable position. Insofar as she discouraged Nettles (either implicitly or explicitly) from applying for the job by stating that a raise was not a certainty, Logiotatos did so only because of her assessment (borne of her own observations of Nettles' performance in attempting to cover accounts payable duties following Kellum's resignation) that Nettles lacked the necessary expertise and know-how to perform the accounts payable job at a satisfactory level.

[8] To be sure, there is evidence that Kellum continued receiving a higher hourly wage than Nettles throughout the period of Kellum's employment. Specifically, Nettles testified that during the two-year period predating her June 2013 EEOC Charge, she was paid a total of $2,400 less than her colleagues in the accounts payable position (which was Kellum until January 2013, then Tonya Whigham). However, the evidence admitted at trial does not allow the Court to compare specific annual raises given to Kellum and Nettles each year, or to quantify the precise differences in their pay at any point in time after their initial hire. There is no evidence, for example, that in any particular year Nettles received a smaller pay increase than Kellum, much less that Daphne Utilities was motivated by race in doling out such raises.

### D.    Defendant's Hiring and Pay Decisions as to Tonya Whigham.

Following Kellum's departure in January 2013, Daphne Utilities hired a Caucasian female named Tonya Whigham to fill the accounts payable position. Whigham's credentials included a two-year college degree in business management and accounting, as well as more than 20 years of experience as an accounting manager / office manager (including general ledger, accounts payable, accounts receivable and payroll duties) for a company called Infinite Business Solutions, earning a final rate of pay of $14.50 when she left the job in July 2012. Most recently, Whigham had worked briefly at a friend's veterinary practice; however, she was not presently employed when she applied for the Daphne Utilities position. Logiotatos was struck by Whigham's extensive accounting and collection experience, as well as her degree in business management and accounting. In selecting a starting rate of pay for Whigham, Logiotatos considered those factors, the nature of the accounts payable position, and her prior pay rate of $14.50 (again, in keeping with Logiotatos's philosophy of offering new hires a little more in order to entice them to come to work for Daphne Utilities). Logiotatos ultimately set Whigham's starting pay at $14.70 per hour. At the time, Nettles was earning $14.39 per hour, or $0.31 less than Whigham.

During the relevant time period that Whigham and Nettles worked together at Daphne Utilities, the division of labor remained much the same as it had been during Kellum's employment. The accounts payable technician (Whigham) performed all accounts payable duties, and assisted with the accounts receivable function by maintaining a cash drawer and balancing it each day. On a daily basis, however, the accounts receivable technician (Nettles) did not perform accounts payable functions or materially assist Whigham in the performance of such duties. Whigham was trained as to the accounts payable duties at Daphne Utilities by Logiotatos and Rebecca Williamson, the Accounting Assistant.

### III.   Conclusions of Law.

As noted, Nettles' only triable claim is that Daphne Utilities discriminated against her on the basis of race, in violation of Title VII and § 1981, by paying her less than similarly situated white co-workers, Kellum and Whigham. At trial, a plaintiff in Nettles' position "bears the ultimate burden of proving that discriminatory animus was a determinative factor in the adverse employment decision." *Palmer v. Board of Regents of University System of Ga.*, 208 F.3d 969, 974 (11th Cir. 2000); *see also Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1322 (11th Cir.

1999) (at trial, "Plaintiffs had the ultimate burden of persuading the jury that Wal-Mart discriminated against Plaintiffs"). The plaintiff may satisfy this burden "either directly by persuading the fact finder that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Palmer*, 208 F.3d at 974 (citation and internal marks omitted).

Either way, the proper inquiry remains whether race was a motivating factor in the challenged employment action. *See, e.g., Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999) (proper legal standard is whether plaintiff's protected characteristic "was a motivating factor in the Defendant's decision to terminate the Plaintiff"); *Dudley*, 166 F.3d at 1322 (identifying proper legal standard as whether plaintiff proved by a preponderance of the evidence that race "was a substantial or motivating factor in Defendant's employment decisions"); *Eleventh Circuit Civil Pattern Jury Instructions* (2013 ed.), § 4.5 (in race discrimination cases, plaintiff must prove by a preponderance of the evidence that race "was a motivating factor that prompted" the adverse employment action). The Court thus examines whether Nettles has met her burden of proving by a preponderance of the evidence that race was a motivating factor in Daphne Utilities' decision to pay her less than white co-workers Pam Kellum and Tonya Whigham.[9]

---

[9] Now is an appropriate time to clear up three misconceptions in the parties' written submissions concerning the applicable legal standard. First, in their Joint Pretrial Document and in defendant's post-trial brief, the parties propose that Nettles' claims be reviewed using the *McDonnell Douglas* burden-shifting framework of *prima facie* case, legitimate nondiscriminatory reason, and pretext. (Doc. 126, at 2; doc. 182, at 1-2.) This formulation of legal elements is incorrect for trial purposes. *See, e.g., U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 713-14, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("Because this case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a *prima facie* case. We think that by framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination *vel non*."); *Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012) (where case has been fully tried on the merits, "it is not now appropriate for us to look back to determine whether" plaintiff established *prima facie* case, but "[i]nstead, we must proceed directly to the ultimate question"); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) ("After a trial on the merits, an appeals court should not revisit whether the plaintiff established a prima facie case. … The only relevant question becomes whether Cleveland's termination was motivated by her disability."); *Farley*, 197 F.3d at 1333 ("The *McDonnell Douglas* stages are simply a method of analysis for organizing a discrimination case in its initial stages to determine if a case has enough evidence to reach a jury in the first place. … [O]nce the *McDonnell Douglas* framework (Continued)

As an initial matter, plaintiff has established that she was paid less than two white co-workers (Kellum and Whigham) who held the same job title (Accounting Technician). But the Court finds that Nettles has failed to prove that the complained-of pay disparity was motivated by race. Nettles' job duties were fundamentally different than those of her white comparators. Nettles' primary duty was to perform the accounts receivable function at Daphne Utilities, while Kellum's and Whigham's primary duty was to perform the accounts payable function. Historically, Daphne Utilities always paid its accounts payable technician a higher hourly wage than its accounts receivable technician, simply because of defendant's reasonable business judgment that that the accounts payable job was more difficult, more complex, more time-consuming, and required more skill, effort and responsibility than the accounts receivable job.

---

has been met by both parties in the pretrial stages, it 'simply drops out of the picture'" during trial) (citations omitted); *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 806 (11th Cir. 1995) ("When the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff, the question of whether the plaintiff properly made out a *prima facie* case is no longer relevant.").

Second, plaintiff's post-trial brief repeatedly cites to Equal Pay Act cases in defining the governing legal standard. (Doc. 180, at 1-2, 3-4, 9.) This is a Title VII / § 1981 case, not an Equal Pay Act case. "The burdens of proof are different under the two laws." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992). Moreover, to the extent that Nettles relies on Equal Pay Act cases to argue that "[t]he focal point is a comparison of the jobs at issue not the employees" (doc. 180, at 1-2), she misapplies those authorities. Even in Equal Pay Act cases, employee-specific factors such as education and experience remain highly relevant. *See Miranda*, 975 F.2d at 1533 & n.18 (explaining that at *prima facie* case stage, "the jobs and not the employees are compared," but that "[f]actors such as experience and education operate as a defense to liability" in Equal Pay Act context).

Third, in its Motion for Judgment as a Matter of Law, Daphne Utilities argues that Nettles "has not established that her salary was the result of a policy, practice or custom of Defendant Daphne Utilities to violate her right to be free from race discrimination." (Doc. 178, ¶ 4.) There are authorities recognizing that where, as here, a § 1981 claim is asserted against a governmental entity using the vehicle of § 1983, proof of a custom or policy is necessary. *See, e.g., Dunklin v. Montgomery County Bd. of Education*, 652 F. Supp.2d 1226, 1235 (M.D. Ala. 2009) (collecting cases). But Daphne Utilities neglected in the Joint Pretrial Document to identify "policy, practice or custom" as an element that plaintiff must prove at trial. Having omitted that item from the Joint Pretrial Document, defendant has waived any right to seek judgment as a matter of law based on plaintiff's failure to adduce proof of same. A litigant cannot remain silent as to the existence of an element of proof of the plaintiff's claim in the Joint Pretrial Document, then demand judgment at the close of trial based on plaintiff's failure to produce evidence supporting that (heretofore undisclosed) element.

Aside from differences in the positions themselves, Daphne Utilities also relied on non-race differences between the plaintiff and the comparators in fixing different wages for each. Kellum had a college degree in business and more than a decade's worth of accounting-related work experience, including accounts receivable, accounts payable, inventory, reconciliation and payroll. Her most recent job paid $10.00 per hour at the time of her interview at Daphne Utilities. By contrast, Nettles lacked relevant post-secondary education, was currently working as a medical assistant (not relevant to an accounts receivable job) for $8.20 per hour, and had relevant work experience only as a bank teller. Logiotatos weighed all of these nondiscriminatory factors in offering Kellum a starting salary of $10.37 per hour, as compared to $9.39 for Nettles at the same time. The same is true with respect to Whigham, who arrived at Daphne Utilities with a two-year college degree in business management and accounting, as well as more than 20 years of experience as an accounting manager / office manager (including general ledger, accounts payable, accounts receivable and payroll duties), whose final rate of pay in that position was $14.50.

In short, Daphne Utilities established at trial that it paid Nettles less than Kellum and Whigham not because of race, but because (i) Kellum's and Whigham's job was more complex and time-consuming, and required more skill and responsibility, than Nettles' job; (ii) Daphne Utilities had historically paid the occupant of the Kellum / Whigham job more than the occupant of the Nettles job; (iii) Daphne Utilities valued Kellum's and Whigham's superior educational background and relevant work experience, both of which exceeded Nettles'; and (iv) Daphne Utilities adhered to its practice of offering new hires increases over their last pay rates to encourage them to accept the job. The Court finds these stated non-discriminatory reasons for the pay differential to be credible, and rejects plaintiff's contention that defendant's proffered explanations are so unbelievable as to amount to a cover-up (*i.e.*, a pretext for race discrimination).[10]

---

[10] In so concluding, the Court has carefully considered each of plaintiff's pretext arguments and the corresponding proof. For example, plaintiff points to evidence that Nettles and Kellum had been cross-trained to perform each other's job functions as proof that their jobs were actually the same. This argument misses the point. Defendant's evidence was – and the Court finds – that, regardless of cross-training, Kellum's day-to-day job duties diverged markedly from Nettles'. Even if they were capable of performing each other's jobs, the fact is that they did not routinely do so. Kellum's focus each day was on her accounts payable duties. (Continued)

The ultimate question in this case is whether Voneka Nettles has shown by a preponderance of the evidence that her race was a motivating factor that prompted Daphne Utilities to pay her a lower hourly wage than her white colleagues, Pam Kellum and Tonya Whigham.  The Court, in its role as fact finder following a non-jury trial, answers that question in the negative.  Daphne Utilities paid Nettles less than Kellum and Whigham for legitimate reasons wholly unrelated to race.  Daphne Utilities reasonably determined that Kellum and Whigham warranted higher pay because they performed a tougher, more burdensome job each day than Nettles did; because they came to the utility with higher levels of education and relevant experience than Nettles did; and because their starting salaries were set by reference to their prior

---

Nettles' focus each day was on her accounts receivable duties.  The accounts payable job was more difficult, more complex and required more skill, effort, and responsibility than the accounts receivable job.  In recognition of that fact, it was an entirely reasonable nondiscriminatory decision for Daphne Utilities, as a matter of policy, to pay the accounts payable technician more than the accounts receivable technician, whether or not they had been trained to cover each other's duties in a pinch.  Next, plaintiff argues that Nettles actually did the same thing each day as Kellum and Whigham did.  The Court makes a specific finding of fact, based on the evidence presented at trial, that she did not.  There were substantial differences in their everyday job duties and responsibilities, and plaintiff's attempt to reduce those divergent functions to the identical acts of handling funds, posting payments, pressing keys and entering data into a computer system is both an oversimplification and a distortion of what actually happened.  Plaintiff also quarrels with defendant's use of education and experience as factors in the compensation calculus for Kellum and Whigham, but Logiotatos testified that those attributes mattered to her in fixing starting salaries.  It is hardly unreasonable, unbelievable or implausible to suggest that an employer might value incoming accounting employees more highly if they have more extensive educational and work backgrounds bearing directly on accounting functions.  Finally, plaintiff challenges Daphne Utilities' evidence that Whigham's starting pay was set slightly above her previous $14.50 hourly wage to encourage her to accept the position.  Plaintiff contends this assertion is pretextual because Whigham was unemployed at the time and, perhaps, needed no additional financial inducement.  This argument amounts to idle second-guessing of the employer's reasonable business judgment.  Logiotatos had an established practice of offering new employees wages above their previous pay to encourage them to accept the job.  It was not unreasonable (or indicative of pretext) for her to adhere to that practice with respect to Whigham, notwithstanding the fact that Whigham was not currently employed and the "bump" may or not have been necessary to convince her to accept the job given her particular circumstances.  The Court concludes that Daphne Utilities' explanation for the subject pay differences was not so unbelievable as to amount to a cover-up, and further finds that defendant's stated reasons were, in fact, the real reasons for the challenged pay disparity.

(higher) wages.  In short, the Court finds that race was not a motivating factor in the challenged compensation decisions.

## IV. Conclusion.

For the foregoing reasons, the Court finds for the defendant, Daphne Utilities, and against the plaintiff, Voneka Nettles, on all claims and causes of action she has asserted herein. Accordingly, it is **ordered** that plaintiff Voneka Nettles shall have and recover nothing from Daphne Utilities.  Final judgment will be entered in favor of defendant, and against plaintiff Nettles, on all claims.

DONE and ORDERED this 17th day of August, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE